**AFFIRMED; Opinion Filed May 16, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-01287-CR

## LARRY DELL CARR, Appellant
## V.
## THE STATE OF TEXAS, Appellee

### On Appeal from the County Court at Law No. 4
### Collin County, Texas
### Trial Court Cause No. 004-84313-2017

## MEMORANDUM OPINION
Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

A jury convicted appellant Larry Dell Carr of driving while intoxicated, a class B misdemeanor, and the court assessed punishment at 100 days' confinement in the county jail. In five issues, appellant argues (1) the trial court erred in not granting appellant's motion to suppress; (2) jury charge error; (3) the evidence was insufficient to prove appellant was intoxicated by a substance; (4) the State should not have been allowed to introduce evidence of a controlled substance; and (5) cumulative error. We affirm.

#### DISCUSSION

#### Sufficiency of the Evidence

We begin with appellant's third issue, in which he argues the evidence is insufficient to prove he was intoxicated by a substance. More specifically, appellant claims his behavior and statements showed he was not intoxicated, and that his blood alcohol content showed he was not

intoxicated from alcohol.  In addition, he argues there was no evidence the phencyclidine (PCP) in his blood had an intoxicating effect on him.

A person commits the offense of driving while intoxicated if he is intoxicated while operating a motor vehicle in a public place.  TEX. PENAL CODE ANN. § 49.04(a).  Intoxication is defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body," or "having an alcohol concentration of 0.08 or more."  *Id*. § 49.01(2).  The indictment in this case did not identify the nature of the intoxicating substance.

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a factfinder was rationally justified in finding guilt beyond a reasonable doubt.  *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).  The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  *Temple*, 390 S.W.3d at 360.  Furthermore, when, as in this case, the court's charge authorizes the jury to convict on more than one theory, the verdict will be upheld if the evidence is sufficient on any of the theories.  *Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).

According to the record, at around 8:00 p.m. on the evening of Sunday, December 4, 2016, Officer Jonathan Burch of the Plano Police Department was on patrol, traveling southbound on K Avenue, in Plano, Texas, when he noticed a white Ford Taurus traveling northbound that had a driver's side "blown head light."  He made a U-turn and got behind the vehicle.  He noticed that it was traveling at 15 to 20 miles per hour, slower than the posted speed limit, which he estimated to be 30 or 35 miles per hour, and that it was having trouble maintaining a single lane.  He also

noticed it "was weaving back and forth a little" and that it would weave to the right. In addition, the passenger's side tires were crossing the lane dividing line.

The officer decided to initiate a traffic stop and activated his overhead lights. When he did this, the police car's dashboard camera started recording.[1] But the Taurus did not stop and it continued traveling northbound on what was now Municipal for about another two blocks before turning right onto 14th Street. The vehicle picked up speed as it headed east on 14th Street, traveling at speeds of up to around 50 miles per hour. It went about twelve blocks before pulling into a grocery store parking lot, where it parked in a designated parking spot in the back of the parking area, within the parking lines. The officer noted that traffic was light that evening and there had been ample opportunity for the vehicle to pull over.

When the car stopped, the driver of the vehicle, appellant, attempted to open the driver's side door and get out. Officer Burch yelled at him to stay in the car and close the door, and appellant complied. After updating his location information with dispatch, Burch approached the vehicle and made contact with appellant, the vehicle's sole occupant. The officer noticed appellant had slurred speech, bloodshot, watery eyes, and there was "the faint odor of alcohol, [an] alcoholic beverage emitting from [appellant's] breath." Burch had to ask appellant for his driver's license and identification information "multiple times," according to the officer's testimony. The first time Burch asked, appellant "just kind of sat there and just kind of stared off," and he "would start moving around and then stopped trying to remember what [the officer] was asking for." When Burch asked again, appellant just started reaching around the vehicle grabbing at "other things like cigarettes and stuff." Burch noticed appellant's finger dexterity was "[n]ot very good." Appellant "was fumbling around his wallet and having trouble retrieving his driver's license so he just handed

_____

[1] Burch explained that the dashboard camera could go back and capture approximately thirty or so seconds of footage from before the overhead lights were turned on, which normally activated the camera.

–3–

[Burch] his whole wallet."

Officer Burch eventually found appellant's identification and asked him to exit the car to further investigate whether appellant was intoxicated. Burch patted appellant down for safety, and then had him sit on the curb next to the vehicle while they spoke. Appellant said he was coming home from work in Dallas and that he lived in Dallas. Burch asked appellant if he knew what city he was in, and appellant said he was in Dallas. Since they were in Plano, not Dallas, this raised additional suspicions. Burch also asked appellant if he had any medical problems, and appellant initially denied he suffered from any medical issues, and then started complaining that he had had a broken jaw and a broken leg. The officer decided to administer standardized field sobriety tests.

The grocery store parking lot where Burch administered the field sobriety tests was level and well-lighted. Burch conducted three field sobriety tests there—the horizontal gaze nystagmus (HGN) test, the walk-and-turn test, and the one-leg stand test. Appellant failed all three, exhibiting all six clues of intoxication on the HGN test, seven out of eight on the walk-and-turn test, and three out of four clues on the one-leg stand test. The officer again asked appellant about the medical problems he had referred to, and appellant said his balance was unsteady and that one leg was shorter than the other. Burch testified, however, that these were not reasons to not administer the field sobriety tests. Based on what he had observed, Officer Burch arrested appellant for driving while intoxicated and transported him to the Plano City Jail.

At the jail, Burch read appellant the form DIC-24 warnings[2] and asked him for a blood sample. When appellant refused, the officer completed a probable cause affidavit in order to obtain a search warrant for appellant's blood. A little over two hours after appellant was stopped, a phlebotomist, Michael Conn, came to the jail and drew a sample of appellant's blood, and this

---

[2] The DIC-24 is the Texas Department of Public Safety's standard form containing the written warnings required by the transportation code to be read to an individual arrested for DWI before a peace officer requests a voluntary blood or breath sample. *See* TEX. TRANSP. CODE ANN. § 724.015; *State v. Neesley*, 239 S.W.3d 780, 782 n. 1 (Tex. Crim. App. 2007).

sample was submitted to the Department of Public Safety (DPS) crime lab for analysis. The test results showed 0.011 grams of alcohol per 100 milliliters of blood, well under the legal limit, and PCP was detected at a level of at least .02 milligrams per liter.

A DPS toxicologist, Dana Baxter, testified that PCP has no approved medical use and that it is illegal in Texas and across the United States. The DPS lab does not quantify the amount of PCP in the blood beyond an administratively set cut-off level of .02 milligrams per liter—a level at which, according to Baxter's testimony, PCP certainly could be having an effect on the user. She added that the cut-off was designed "so that if there is enough of the drug to be having an effect, it's going to appear on the report as detected."

Baxter testified that PCP was developed as an anesthetic and removed from the market because of its unpredictable side effects. PCP is a "dissociative anesthetic," which means that it interferes with senses of time and space, and the user can feel as though he is outside of events that are happening to him. Also, the user does not feel pain. PCP can act as a central nervous system depressant. The user can have difficulty concentrating and the drug can slow their reaction times. In addition, PCP's effects are cyclic. At times, the user will experience periods of stupor, where their eyes are open and they simply stare straight ahead. These periods are followed by "highs" where the user becomes "very agitated" and he "can feel . . . again." PCP's effects are generally felt within four to six hours of ingestion, but a true return to normal can take up to twenty-four hours. Additionally, chronic users may feel the effects anywhere from seven hours to seven days after ingestion. Baxter testified that someone under the influence of PCP is not safe to drive a motor vehicle. And if mixed with alcohol, PCP can have additional effects on the user's central nervous system, making the user sleepier, slowing their reaction times even further, and resulting in HGN and blurred vision.

The video from the dashboard camera in Officer Burch's patrol car began with the officer

following appellant's white Ford Taurus. Burch activated his emergency lights and he could be heard calling in the vehicle's license plate number to dispatch. The Taurus was in the left lane and signaled before moving over to the right lane, and then it moved back over to the left lane. It signaled again before making a right turn, after which Burch activated his siren. Appellant's vehicle did not stop, however, and it accelerated with Officer Burch's vehicle in close pursuit. Burch could be heard telling dispatch, "This vehicle is not stopping." The Taurus weaved slightly as it continued moving at a high rate of speed for several more minutes, eventually coming to a stop in the grocery store parking lot. The driver's side door opened and Officer Burch yelled, "Stay in the car. Shut the door." Appellant complied, after which Burch walked over to the driver's side of the Taurus and began talking with appellant. He identified himself and asked appellant to shut off the engine; appellant complied.

Appellant asked Burch what the problem was, and Burch asked appellant to hand over the keys, which the officer accepted and tossed onto the top of the car. Burch said he had been following appellant since Municipal and 14th streets, that appellant had kept driving and did not stop, that he was driving slowly, had a headlight out, and he was having trouble maintaining a single lane. The officer asked appellant for a driver's license and proof of insurance. Appellant indicated he did not have that, and Burch asked appellant if he had any form of identification. Appellant said, "No, I don't have a life." Appellant again asked what the problem was, and Burch repeated that appellant had a headlight out, was driving slowly, and was not maintaining a single lane. The officer emphasized that he needed some form of identification. Appellant said he did "not have ID because . . . ," and his voice trailed off. He mumbled and slurred his words, telling the officers they were "on fire" and asking whether they were going to shoot him. Burch eventually asked for appellant's name and date of birth. He took down that information and asked appellant to step out of the vehicle. Officer Burch patted down appellant, who was having trouble standing.

–6–

He ordered appellant to sit on the curb and then walked over to his vehicle and talked to dispatch.

When Burch returned to where appellant was sitting on the curb, he asked appellant what city he was in, and appellant said, "Dallas, Texas." Burch asked appellant what he had to drink that day, and appellant said, "Nothing." The officer asked appellant if he had any medical problems, and he again asked appellant how much he had to drink, telling him he was slurring his words. Appellant then did the HGN and the walk-and-turn tests, followed by the one-leg stand test. When appellant performed the walk-and-turn and one-leg stand tests, he had trouble following the officer's instructions. Burch told him to take nine heel-to-toe steps down the line and to return with nine more steps, but appellant took over twenty steps without turning around and stepping back, as he had been instructed. Burch also had to explain the one-leg stand test twice, and appellant struggled to maintain his balance, using his arms to steady himself. After appellant had been placed under arrest and put in the back of the patrol car, he complained that he was not intoxicated, telling the officer he had only one beer. Throughout this process appellant continued to mutter and mumble, and frequently slurred his speech.

We conclude there is ample evidence in this record to support the jury's verdict. There was evidence PCP was present in appellant's blood. Although the toxicologist could not quantify the precise amount, she testified that *any* use of PCP is illegal in Texas and that at the cut-off amount of .02 milligrams per liter, a user could feel its effects. She also testified that PCP mixed with alcohol could have additional effects on the user's central nervous system, making him sleepier, slowing his reaction times even further, and resulting in HGN and blurred vision. Officer Burch testified regarding the details of the stop, explaining that appellant drove erratically, sped up and drove an additional twelve blocks when Burch activated his lights, attempted to exit the vehicle before Burch could approach, stared straight ahead as if in a stupor while Burch spoke to him, had bloodshot, watery eyes, slurred speech, was unable to follow Burch's directions, could

not remove his driver's license from his wallet, displayed HGN, and failed two other field sobriety tests.

Appellant argues that the blood test showed only a 0.011 blood alcohol level and that he "did several things correctly while driving," such as using his turn signal and parking in a designated parking spot (and within the parking lines) after pulling into the grocery store parking area. He further points out that he told the officer he had medical issues, suffering from a broken jaw and a broken leg. But the record is unclear regarding the nature of these alleged injuries, much less when they occurred. Appellant also told the officer during the field sobriety testing that his balance was unsteady and one leg was shorter than the other, yet Officer Burch testified these were not reasons to not proceed with the field sobriety tests. In the end, the jury was free, in its role as the sole judge of the weight and credibility of the evidence, to resolve these issues against appellant. Based on a review of all of the evidence in the light most favorable to the verdict, we conclude a rational fact finder could have found beyond a reasonable doubt that appellant was intoxicated. We overrule appellant's third issue.

## Motion to Suppress

In his first issue, appellant contends the trial court erred in failing to suppress evidence of intoxication obtained from a search warrant for a blood draw. According to appellant, the search warrant was invalid because the supporting affidavit, i.e., the "Blood Warrant Affidavit," did not name him in the "factual portion" and, therefore, did not establish probable cause for the search. And absent probable cause, the search allegedly violated the Fourth Amendment, article I, section 9 of the Texas Constitution,[3] and articles 1.06 and 38.23 of the Texas Code of Criminal Procedure.[4]

---

[3] Article I, section 9 of the Texas Constitution, along with the Fourth Amendment to the United States Constitution, protects individuals from unreasonable searches and seizures. *Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014).

[4] Article 1.06 parallels the Fourth Amendment regarding searches and seizures. *See* TEX. CODE CRIM. PROC. ANN. art. 1.06. Article 38.23 states that no evidence obtained in violation of any provisions of the state or federal constitutions shall be admitted into evidence against the accused on the trial of any criminal case. *See id*. art. 38.23.

A search warrant may not issue unless it is based upon probable cause, established by a sworn affidavit. U.S. CONST. AMEND. IV; TEX. CODE CRIM. PROC. ANN. art. 18.01(b); *State v. Jordan*, 342 S.W.3d 565, 568 (Tex. Crim. App. 2011). The test is whether a reasonable reading by the magistrate would lead to the conclusion that the four corners of the affidavit provide a "substantial basis" for issuing the warrant. *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012). "Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a 'fair probability' that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued." *Jordan*, 342 S.W.3d at 568–69. "The magistrate may interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences from the facts and circumstances contained within its four corners." *Id*. (citing *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010)).

Where the search warrant sought is for blood evidence to prove intoxication, the magistrate typically must determine probable cause exists that a blood test would provide evidence showing appellant was intoxicated. *Islas v. State*, 562 S.W.3d 191, 196 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Thom v. State*, 437 S.W.3d 556, 561 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Whether the facts stated in the affidavit establish probable cause depends on the totality of the circumstances. *Islas*, 562 S.W.3d at 196; *State v. Dugas*, 296 S.W.3d 112, 116 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

We typically apply a bifurcated standard of review to a trial court's ruling on a motion to suppress by giving almost total deference to the trial court's determinations of fact and reviewing de novo the trial court's application of law. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). Where, as in this case, the motion to suppress is based on a magistrate's decision to issue a warrant, there are no credibility determinations to which we must defer because the trial court is constrained to the four corners of the affidavit. *See State v. Webre*, 347 S.W.3d 381, 384

–9–

(Tex. App.—Austin 2011, no pet.). Nonetheless, in reviewing the magistrate's decision to issue a warrant, we apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant as opposed to a warrantless search. *McLain*, 337 S.W.3d at 271; *see Illinois v. Gates*, 462 U.S. 213, 236 (1983). As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable cause determination. *Id.* In doubtful or marginal cases, the magistrate's determination should prevail. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). The magistrate may interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences from the facts and circumstances contained within its four corners. *Jordan*, 342 S.W.3d at 569. The focus is not on what other facts could or should have been included in the affidavit; rather, the focus is on the combined logical force of facts that are actually in the affidavit. *Duarte*, 389 S.W.3d at 354–55.

> The opening paragraph of the three-page "Blood Warrant Affidavit" reads as follows:

> I, Officer J. #1825 Burch Badge: 1825, a peace officer employed by the Plano Police Department, do solemnly swear that I have reason to believe and do believe that on or about December 04, 2016 in COLLIN County, Texas, Carr, Larry Dell Jr B/M 12/05/1973 (hereinafter called Suspect) did then and there commit an offense relating to the operation of a vehicle while intoxicated, namely: PC 49.04(a) — Driving While Intoxicated; and that evidence relating to this offense, namely blood from and within the person of Suspect, is located in COLLIN County, Texas.

In particular, the first paragraph of the affidavit identifies "Carr, Larry Dell Jr B/M 12/05/1973 (hereinafter called Suspect)" as the individual that Officer Burch believed had committed the offense of driving while intoxicated. Throughout the remaining paragraphs of the affidavit, Burch referred to appellant as "Suspect." In the next to last paragraph, Burch asserted that he "identified the Suspect through his drivers [sic] license" and "verified the accuracy of this identity [sic] information by comparing the photo on the card and to the face of defendant and determined them to be the same."

Although Officer Burch did not use appellant's name when he referred to him in the remainder of the affidavit, the magistrate could have reasonably concluded Burch was referring to appellant when he used the word "Suspect." The identifying information Burch provided in the first paragraph, together with his explanation of how he verified that information, was sufficient to establish that it was, in fact, appellant whose blood would contain evidence of intoxication. We conclude the trial court had a substantial basis for finding the affidavit established probable cause for the search and seizure of appellant's blood. Therefore, the trial court did not err in denying appellant's motion to suppress, and we overrule appellant's first issue.[5]

## Jury Charge

In his second issue, appellant argues the trial court erred by charging the jury with a .08 blood alcohol level application paragraph when there was no evidence to support that charge. The State agrees the evidence did not warrant submission of this instruction but argues that appellant, who did not object to it, was not egregiously harmed.

The jury charge in this case reads in part as follows:

A "public place" means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

"Intoxicated" means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body, or having an alcohol concentration of 0.08 or more.

Now, if you find and believe from the evidence beyond a reasonable doubt that on or about DECEMBER 4TH, 2016, in Collin County, Texas, the defendant, LARRY DELL CARR, JR, did then and there operate a motor vehicle in a public place while the said defendant was intoxicated by not having the normal use of his mental faculties by reason of the introduction of alcohol, a controlled substance, a drug, a

---

[5] Although appellant also cites article I, section 9, of the Texas Constitution and articles 1.06 and 38.23 of the Code of Criminal Procedure, he does not separately argue his state law claims or present any argument asserting that these provisions afford him greater protections than the Fourth Amendment. Accordingly, these state law contentions present nothing for review. *See Manns v. State*, 122 S.W.3d 171, 192 n. 97 (Tex. Crim. App. 2003).

dangerous drug, a combination of two or more of those substances, or any other substance into the body, then you will find the defendant guilty as charged.

Or, if you find and believe from the evidence beyond a reasonable doubt that on or about DECEMBER 4TH, 2016, in Collin County, Texas, the defendant, LARRY DELL CARR, JR., did then and there operate a motor vehicle in a public place while the said defendant was intoxicated by not having the normal use of his physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body, then you will find the defendant guilty as charged.

Or, if you find and believe from the evidence beyond a reasonable doubt that on or about DECEMBER 4TH, 2016, in Collin County Texas, LARRY DELL CARR, JR. did then and there operate a motor vehicle in a public place while the said defendant was intoxicated by having an alcohol concentration of at least 0.08, then you will find the defendant guilty as charged.

The jury charge authorized appellant's conviction based on the per se theory of alcohol intoxication—proof of a blood alcohol level of .08 or higher—when the evidence at trial showed a blood alcohol level of only .011. This was error. The jury charge must set forth the "law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14; *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004); *Psyk v. State*, No. 09–16–00154–CR, 2018 WL 1866163, at *10 (Tex. App.—Beaumont Apr. 18, 2018, no pet) (mem. op., not designated for publication). The trial court is required to "fully instruct the jury on the law applicable to the case and to apply that law to the facts presented." *Gray*, 152 S.W.3d at 127 (quotations and citation omitted). It is not enough for the charge to merely incorporate the allegation in the charging instrument; it must also apply the law to the facts adduced at trial. *Id*. Although the trial court is required to include statutory definitions in the charge that affect the meaning of the elements of the crime, the charge must be tailored to the facts presented at trial. *See Villareal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009); *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011); *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010); *Psky*, 2018 WL 1866163, at *10. A "trial court must submit to the jury only the portions of the statutory definition of 'intoxicated' that are supported by the evidence." *Burnett v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017). "To do otherwise

–12–

is error." *Id.*

Because appellant did not object to this error, we must now determine whether it egregiously harmed him. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *Psky*, 2018 WL 1866163, at *10. In determining harm, we look at the entire charge, the state of the evidence, including the contested issues and weight of probative evidence, the arguments of counsel, and any other relevant information revealed by the trial record. *See Almanza*, 686 S.W.2d at 171.

Appellant argues that "the court's erroneous charge signaled to the jury a significance of the alcohol blood test that was not merited. The 'per se' charge suggested that to the jury that the alcohol could have been at an intoxicating level." However, evidence of appellant's ingestion of alcohol was merely incidental to the State's case. The State made no attempt to prove appellant's blood alcohol level was .08 or higher. Consistent with the .011 blood alcohol test results, the State presented evidence that appellant's breath smelled faintly of alcohol and that he admitted to drinking one beer that night. On the other hand, the State spent far more time developing evidence of PCP ingestion through the testimony of the toxicologist, Dana Baxter. Furthermore, defense counsel argued in his closing that, given the .011 test results, the State had failed to prove alcohol intoxication. The State did not dispute this, arguing that appellant was intoxicated by the ingestion of PCP. Finally, as we have seen, there is considerable evidence of appellant's intoxication by PCP. Officer Burch's testimony describing appellant's behavior at the scene and the video recording from his dashboard show appellant did not have the normal use of his mental and physical faculties. Moreover, the testimony of Officer Burch and the toxicologist showed that the impairments appellant displayed were consistent with PCP use. When viewed under the totality of the record, we conclude appellant suffered no egregious harm as a result of the complained-of charge error, and we overrule appellant's second issue.

**Admissibility of Drug Evidence**

In his fourth issue, appellant contends the trial court erred by allowing the State to introduce evidence regarding a controlled substance—i.e., the DPS toxicologist's testimony that appellant's blood contained PCP. Appellant argues this evidence was irrelevant under rule 401 and "more prejudicial than probative" under rule 403.

During a rule 702 hearing held outside the presence of the jury, Baxter testified that she could not say precisely how much PCP was in appellant's system—no quantification was performed. The .02 cut-off level was administratively set "[s]o if there is any drug present at or above our cut-off level, then it appears on our report as detected." She also explained that "the cut-off point is set such that if it is there at that level or above, it is likely having an effect. And so I can't say that it's not having an effect if it's reported as detected." The defense objected to Baxter's testimony based on rules 401 and 403, arguing her testimony invited the jury to speculate regarding the PCP amount. In other words, there was no quantification, numbers or data provided to the jury on exactly how much PCP was in appellant's system, and the jury could speculate regarding whether or not it was actually having an effect on appellant. The trial court overruled the objections, finding the defense's concerns went to the weight of the evidence, not its admissibility, and that the probative value of Baxter's testimony outweighed any prejudice.

The trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). The trial court abuses its discretion if its decision falls outside the zone of reasonable disagreement. *Id*. at 83.

"Generally, all relevant evidence is admissible." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009); TEX. R. EVID. 402. Relevant evidence is that which has any tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. TEX. R. EVID. 401. When determining whether evidence is relevant, it is important for

courts to examine the purpose for which the evidence is being introduced. *Layton*, 280 S.W.3d at 240. "It is critical that there is a direct or logical connection between the actual evidence and the proposition sought to be proved." *Id.*

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Hernandez v. State*, 390 S.W.3d 310, 323 (Tex. Crim. App. 2012). Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *See Henley*, 493 S.W.3d at 102; *Hernandez*, 390 S.W.3d at 323. A proper rule 403 analysis includes, but is not limited to, four factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *See Henley*, 493 S.W.3d at 102. Also, under a proper rule 403 analysis, an appellate court considers whether there is any tendency of the evidence to confuse or distract the jury from the main issues as well as any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence. *See Henley*, 493 S.W.3d at 102 (discussing *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006)).

All evidence against a defendant is, by its nature, designed to be prejudicial. *See Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). "Rule 403 does not exclude all prejudicial evidence, only evidence that is unfairly prejudicial." *Henley*, 493 S.W.3d at 102 (citing *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)). "Unfair prejudice" refers only to relevant evidence's tendency to tempt the jury into reaching a decision on grounds apart from the proof presented in support of the claim. *See Henley*, 493 S.W.3d at 102; *Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003). If the evidence relates directly to elements of a particular claim, it may be prejudicial, but not unfairly so. *See Henley*, 493 S.W.3d at 102; *Manning*, 114 S.W.3d

at 928. Furthermore, absent an explicit refusal to conduct the rule 403 balancing test, we presume the trial court conducted the test when it overruled a rule 403 objection. *See Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).

Appellant argues that evidence PCP was detected in his blood was irrelevant because there was no evidence the drug affected him while he was driving, and that, consequently, the jury was left to "speculate wildly" on the significance of its presence in his blood. But the trial court could have concluded the PCP evidence was highly probative regarding an element the State was required to prove to convict appellant—i.e., his intoxication. The State did not limit itself to proving intoxication by any particular substance. Conviction was authorized by proof of "alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance." *See* TEX. PENAL CODE ANN. § 49.01(2). The presence of PCP in appellant's blood tended to make it more probable he did not have the normal use of his mental or physical faculties because of the introduction of some substance or combination of substances into his body.

Appellant also argues that because the evidence showed only a confirmation level of PCP in his blood, it did not establish that it affected his faculties while he was driving, thereby rendering its detection irrelevant. Yet the fact that the precise amount of PCP in appellant's blood was not determined does not render such evidence irrelevant. Indeed, that fact concerns the weight and sufficiency of the evidence of intoxication, not its relevance and admissibility. *See Ashby v. State*, 527 S.W.3d 356, 364 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) ("The failure to quantify the amount of TFMPP in this instance concerns the weight and sufficiency of the scientific evidence, but not its relevance and admissibility.").

Additionally, appellant argues that the toxicologist was unable to say the PCP affected him while he was driving, but the toxicologist testified at the rule 702 hearing that the cut-off level of

.02 milligrams per liter was set because "at that level or above, it is likely having an effect." Although she acknowledged that she could say for certain that the PCP was, in fact, affecting appellant in some way that night, she pointed out that her report would support what an officer on the scene might have observed. Further, in her testimony before the jury she described the physical and mental impairments that could result from PCP use, such as distortion in time perceptions, not feeling any pain, slowing down reaction times, difficulty concentrating, and periods of stupor followed by highs and agitation. And through the testimony of Officer Burch and his dashboard camera video recording, the State presented evidence that appellant displayed signs of impairment that were consistent with PCP use—e.g., failure on all three field sobriety tests, slurred speech, stupor, and impaired manual dexterity.

In support of his argument, appellant partially relies on *Layton v. State*, 280 S.W.3d 235 (Tex. Crim. App. 2000), but this reliance is misplaced. In that case, the appellant was charged with driving while intoxicated by introduction of alcohol into his system. *Id*. 237. The trial court allowed into evidence the videotape of the stop, in which appellant admitted to taking both Valium and Xanax the previous day. *Id*. The appellant objected to admission of the evidence as irrelevant because there was no evidence the drugs, taken twenty-four hours and fourteen hours prior to his arrest, would have any effect on his degree of intoxication by alcohol; thus, this evidence was irrelevant. *Id*. at 241. The Texas Court of Criminal Appeals agreed, stating there was no evidence "as to the dosage taken by Appellant, the exact time of ingestion, or the half-life of the drug in the human body." *Id*. at 242. It further stated that a lay juror was in no position to determine whether the drugs, taken more than twelve hours before the arrest, would have had any effect on intoxication. *Id*. "There was no testimony indicating that Officer Allen had any medical knowledge regarding the use of Xanax and Valium, or about the effect of combining the medications with alcohol." *Id*.

The situation in the present case is quite different. In *Layton*, the charge was limited to intoxication by the use of alcohol, so expert testimony was needed to establish a connection between the defendant's use of controlled substances and their effect on his intoxication. *See id*. at 241–42. Additionally, the defendant in *Layton* did not provide a blood sample showing how much of the controlled substance was in his system. *Id*. at 237. Unlike the defendant in *Layton*, appellant's charge of driving while intoxicated did not limit the State to the introduction of alcohol into the body. Evidence of PCP in appellant's system was shown through a blood test and this evidence was relevant and probative to assisting the jury in determining whether appellant was intoxicated by any substance or combination of substances.

As for the rule 403 factors, they weigh in favor of admissibility. The trial court could have concluded Baxter's testimony was not only relevant but highly probative for the reasons we have already discussed, and it could have likewise concluded the State's need for this evidence was significant because, as we have already noted, it concerned intoxication, an element the State was required to prove in order to obtain a conviction. Moreover, as for the potential to impress the jury in some irrational but indelible way, the trial court could have found that Baxter's testimony was not so inherently inflammatory as to elicit an emotional response or arouse the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. Nor does appellant direct our attention to any particular aspects of the testimony that would have shown it to be uniquely or unfairly prejudicial. Finally, the State did not spend an inordinate amount of time developing Baxter's testimony regarding the .02 milligrams per liter test results, which takes up less than ten pages of the reporter's record. Based on this record, we conclude the trial court did not abuse its discretion by overruling appellant's rule 401 and 403 objections. We overrule appellant's fourth issue.

**Cumulative Error**

In his fifth issue, appellant argues that the cumulative effect of the errors in this case should be grounds for reversal. But having concluded there was either no error or no harm in resolving appellant's first four issues against him, it follows that there was no cumulative error. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error."); *see also Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) ("Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.'") (quoting *Chamberlain*, 998 S.W.2d at 238); *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) ("non-errors may not in cumulative effect cause error"); *Morrow v. State*, No. 05–16–01218–CR, 2017 WL 5179035, at *6 (Tex. App.—Dallas Nov. 7, 2017, no pet.) (mem. op., not designated for publication); *Underwood v. State*, No. 05–06–01589–CR, 2008 WL 3117077, at *11 (Tex. App.—Dallas Aug. 7, 2008, no pet.) (not designated for publication). Accordingly, we overrule appellant's fifth issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47.2(b)
171287F.U05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

LARRY DELL CARR, Appellant

No. 05-17-01287-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 4, Collin County, Texas
Trial Court Cause No. 004-84313-2017.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of May, 2019.